**NOT FOR PUBLICATION**

```
                   UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY


DARRYL HAMMARY,                :
                               :   Civil Action No. 07-0462 (FLW)
          Petitioner,          :
                               :
          v.                   :   OPINION
                               :
LYDELL SHERRER, et al.,        :
                               :
          Respondents.         :
```

**APPEARANCES:**

Petitioner pro se                Counsel for Respondents
Darryl Hammary                   Mary R. Juliano
C.U.E. House                     Monmouth County Pros. Ofc.
833 Lyons Avenue                 Monmouth County Court House
Irvington, NJ 07111              71 Monument Park
                                 Freehold, NJ 07728


**WOLFSON**, District Judge

   Petitioner Darryl Hammary, a prisoner currently confined at the Center for Urban Education in Irvington, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Lydell Sherrer and the Attorney General of the State of New Jersey.

   For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> We begin with a brief summary of the relevant facts.  On January 22, 2003, an individual placed an order by phone for certain building materials at a home improvement store in Neptune, New Jersey.  The caller identified himself as a person who we will refer to as W.W.  The caller said that he would send one of his workers to the store with a check in the amount of $7,512.42 to pay for the supplies.
>
> The next day, a man who identified himself as Luis Lugo (Lugo) went to the store and presented a check in the amount of $7,512.42.  The check had been endorsed by W.W.  The clerk became suspicious because the check had been endorsed by but not presented by W.W.  An employee of the store contacted W.W. to confirm the sale and W.W. informed him that he had never placed the order nor had he signed the check.  The store reported the incident to the Neptune Township police.
>
> W.W. also reported the matter to the Middletown Township police.  Upon further investigation, W.W. and his wife realized that three checks had been taken from their checkbook.  They contacted the bank and were informed that the check in the amount of $7,512.42 made payable to the home improvement store had cleared on January 22, 2003.  They were additionally informed that another missing check, written in the amount of $4,999.73 also had cleared the bank the same day.
>
> The home improvement store and the police decided to go forward with the delivery of the materials that

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

had been paid for with the forged check.  On January 24, 2003, Lugo contacted the store and provided certain phone numbers where he could be reached.  The delivery was to be made to an address in Asbury Park.  later in the day, Lugo could not be reached at the phone numbers he had provided.  Delivery was attempted but no one was on hand to accept the supplies.

A caller phone the store and advised that a mistake had been made and someone would pick up the supplies after 6:00 p.m.  A truck arrived at the store around 6:20 p.m.  Lugo was driving the truck and Wilfredo Esquilin (Esquilin) was with him.  Lugo entered the store and presented the receipt.  When Lugo left the store, he and Esquilin were arrested.

Detective James Hunt of the Neptune Township Police Department interviewed Lugo.  Lugo said that Esquilin hired him to do construction work and had given him a check for $7,512.42 to pay for the building supplies.  Lugo denied any knowledge of the theft or the forgery.

Hunt also questioned Esquilin, who was in possession of a brown check ledger and a fictitious driver's license in the name of W.W.  Esquilin also was in possession of two checks drawn on Fleet Bank.  One was made payable to Esquilin and the other was made payable to Lugo.  Hunt later determined that the checks were personal checks that had been reported stolen on January 17, 2003.  At the time of his arrest, Esquilin also was in possession of defendant's telephone bill, with an address of 150 Fifth Avenue, apartment 3B3, in Asbury Park.

When questioned by Hunt, Esquilin stated that he was involved with defendant in a scheme to obtain building materials with stolen and counterfeit checks.  Esquilin said that defendant had provided him with the check for the home improvement store, as well as the two counterfeit Fleet Bank checks that he had with him when he was arrested.  Esquilin told Hunt that he met defendant in the lobby of the building at 150 Fifth Avenue in Asbury Park.  According to Esquilin, after defendant met him, defendant gave him the check for the home improvement store.  Defendant then went to an apartment on the third floor and returned with the two Fleet Bank checks.  Esquilin said that defendant

3

planned to have him use one stolen check for the purchase of building supplies and cash the Fleet Bank checks.

Esquilin said that he tried to cash the two checks at a bank in northern New Jersey but he was not able to do so because he did not have the necessary identification. Esquilin contacted defendant, who told him to go to the Division of Motor Vehicles (DMV) to obtain identification. Esquilin went to the DMV and obtained photo identification. The following day, Esquilin tried to cash one of the Fleet Bank checks. The bank manager refused to cash the check. Esquilin called defendant and informed him that he had not [been] able to cash the check.

Esquilin told Hunt of his involvement with defendant in a similar scheme to obtain building materials at a building supply company in Tinton Falls. Esquilin said that defendant phoned in the order and the supplies were to be delivered to 1230 First Avenue in Asbury Park. The building supply company attempted to deliver the materials but no one was at the location to receive the order. Esquilin stated that defendant called the supply company, told the company that his workers had missed the delivery and said that someone would pick up the supplies.

Esquilin later arrived at the supply company in a truck to obtain the materials. He presented a check in the amount of $4,999.73. The check was one of the checks stolen from W.W. Esquilin loaded the supplies into the truck, picked up defendant and drove to Newark, where the supplies were unloaded at a home under construction.

The police determined that the truck used to pick up the materials at the building supply company had been rented by Erik D. Morcilio (Morcilio). Hunt contacted Morcilio, who said that he rented the vehicle for Esquilin. Morcilio claimed that he did not know the truck would be used for criminal activity.

Hunt learned that Joseph Pangaro (Pangaro), a detective with the Ocean Township Police Department, was conducting an investigation into a similar scheme involving the acquisition of building supplies with counterfeit and forged checks. Through his

4

investigation, Pangaro learned the materials obtained with forged checks had been delivered to two addresses in Asbury Park: 906 Cookman Avenue and 1100 Asbury Avenue. Pangaro observed certain building supplies at 906 Cookman Avenue being moved to 908 Cookman Avenue. He observed boilers on the ground between the two properties on Cookman Avenue. In addition, Pangaro discovered that building materials had been signed for by a "John Smith," who exited the house at 908 Cookman Avenue and presented a counterfeit check to pay for the materials.

During his investigation, Pangaro spoke with Tom Young (Young), the superintendent of a building at 906 Cookman Avenue. Young initially denied any involvement in the counterfeit checks and said that he did not know anything about materials delivered to 906 Cookman Avenue. However, Young later informed Pangaro that defendant supplied counterfeit checks for building materials that were delivered to 906 Cookman Avenue.

Young additionally informed Pangaro that defendant stayed at 906 Cookman Avenue and an apartment on Fifth Avenue in Asbury Park. Through further investigation, Pangaro learned that 9087 Cookman Avenue is the residence of defendant's sister, Donna Hammary (Donna). Based on additional information that he obtained and the building supplies he had observed at 908 Cookman Avenue, Pangaro concluded that the property was being sued as a storage place for building materials purchased with stolen and counterfeit checks.

Hunt and Pangaro submitted affidavits in support of an application for warrants to search the premises at 908 Cookman Avenue and apartment 3B3 at 150 Fifth Avenue. The municipal court judge granted the application. In the ensuing searches, the police found cocaine, an automatic handgun, computer equipment, a printer, stolen checks, other office equipment and heroin. The grand jury handed up its indictment on June 23, 2003. Donna, Esquilin, Lugo and others were also named in the indictment. After defendant's motion to suppress the evidence obtained in the searches was denied, he pled guilty to three counts in the indictment.

(Opinion of Superior Court of New Jersey, Appellate Division, June 27, 2006, at 3-9.)

B.   Procedural History

Following denial of his motion to suppress evidence obtained in the two searches, Petitioner pleaded guilty to (1) conspiracy to commit theft, (2) possession of a controlled dangerous substance, and (3) second-degree possession of a weapon for an unlawful purpose.  The remaining charges were dismissed.  Defendant was sentenced on October 29, 2004, to an aggregate sentence of eight years imprisonment with a four-year parole disqualifier.

On direct appeal, Petitioner asserted, inter alia, that the warrants obtained for the searches lacked probable cause.  The Appellate Division rejected Petitioner's arguments and affirmed the conviction by opinion issued on June 27, 2006.  On November 9, 2006, the Supreme Court of New Jersey granted certification solely as to a sentencing issue, and remanded to the trial court for resentencing in light of State v. Natale, 184 N.J. 458 (2005).  On January 19, 2007, the trial court re-sentenced Petitioner to a term of eight years imprisonment, with a four-year parole disqualifier.  This Petition followed.

Here, Petitioner asserts (1) that the search warrants' supporting affidavits omitted material information that no sales clerk had placed Petitioner at the scene, (2) that the search

6

warrants' supporting affidavits were based upon uncorroborated hearsay that also omitted any evidence of the informants' veracity, (3) that the search of the apartment violated the tenant's Fourth Amendment rights,[2] and (4) that the police omitted information tending to refute the veracity of the informants whose information was used in obtaining the search warrants.  All of these actions are alleged to violate Petitioner's Fourth Amendment right to be free from unreasonable searches.  Respondents assert that Petitioner had a full and fair opportunity to litigate his Fourth Amendment claims in state court and is thus barred from obtaining habeas relief.  In addition, Respondents assert that the claims are meritless.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

---

[2] The tenant of the apartment was Petitioner's girlfriend. She was a co-defendant and made a separate motion to suppress evidence obtained in the search of the apartment.

7

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

8

where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).]

### III.  ANALYSIS

As noted above, Petitioner asserts that the search warrants, and resultant searches, violated his Fourth Amendment rights to be free from unreasonable searches because of various alleged deficiencies.

Petitioner raised his challenges to the search warrants and searches before the trial court in a motion to suppress evidence. In that motion, Petitioner asserted that the warrants were not supported by probable cause.  Specifically, Petitioner asserted that the supporting affidavits failed to provide sufficient information to establish the bases for the informants' knowledge and veracity. Petitioner also noted that there was no landlord's statement as to the tenant of the apartment to be searched.  In the brief in support of his motion, Petitioner relied upon the United States Supreme Court's Fourth Amendment jurisprudence as set forth in cases including <u>Illinois v. Gates</u>, 462 U.S. 213 (1983), <u>Aquilar v. Texas</u>, 378 U.S. 108 (1964), and <u>Spinelli v. United States</u>, 393 U.S. 410 (1969).

On June 23, 2005, the trial court issued a thorough opinion denying the motions to suppress, reviewing both the factual history regarding the issuance of the warrants and the applicable legal standards.  On May 7, 2004, following Petitioner's and his co-defendant's motions for reconsideration, and oral argument, the trial court again denied the motion to suppress, again detailing the relevant factual and legal considerations with respect to the specific issues raised in the motion for reconsideration.

On direct appeal, the Appellate Division painstakingly reviewed the adequacy of the search warrants, as set forth below:

11

     Defendant first argues that the warrants obtained
for the searches of apartment 3B3 at 150 Fifth Avenue
and the residence at 908 Cookman Avenue lacked probable
cause.  Defendant argues that in the affidavits seeking
the warrants, Hunt and Pangaro relied upon Esquilin's
statements but failed to provide sufficient information
to establish that Esquilin's statements were credible.
Defendant further contends that the information
provided by Hunt and Pangaro was prejudiced and tainted
by omission and manipulation.  We disagree.

     A search that is conducted based upon a properly
issued search warrant is presumed to be valid.  State
v. Sullivan, 169 N.J. 204, 211 (2001) (citing State v.
Valencia, 93 N.J. 126, 133 (1983)).  Defendant has the
burden of proving that the search was invalid,
specifically, "that there was no probable cause
supporting the issuance of the warrant or that the
search was otherwise unreasonable."  Ibid. (quoting
Valencia, supra, 93 N.J. at 133).  When considering a
challenge to the search, the court accords "substantial
deference" to the determination that resulted in the
issuance of the warrant.  Ibid. (quoting State v.
Marshall, 123 N.J. 1, 72 (1991), cert. denied, 507 U.S.
929, 113 S.Ct. 1306, 122 L.Ed. 2d 694 (1993)).

     Before issuing a search warrant, the judge must be
convinced "that there is probable cause to believe that
a crime has been committed, or is being committed, at a
specific location or that evidence of a crime is at the
place sought to be searched."  Id. at 210 (citing State
v. Laws, 50 N.J. 159, 173 (1967), cert. denied, 393
U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968)).
Probable cause is established if there is "a 'well
grounded' suspicion that a crime has been, or is being
committed."  Id. at 211 (quoting State v. Waltz, 61
N.J. 83, 87 (1972)).

     "Information provided by an informant may
constitute a basis for a finding of probable cause, so
long as there is a substantial basis for crediting the
information."  Id. at 212 (citing State v. Smith, 155
N.J. 83, 92, cert. denied, 525 U.S. 1033, 119 S.Ct.
576, 142 L.Ed.2d 480 ()1998)).  The totality of the
circumstances are considered when analyzing an
informant's tip in determining the validity of the
warrant under the Fourth Amendment.  Illinois v. Gates,
462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d

     Defendant first argues that the warrants obtained
for the searches of apartment 3B3 at 150 Fifth Avenue
and the residence at 908 Cookman Avenue lacked probable
cause.  Defendant argues that in the affidavits seeking
the warrants, Hunt and Pangaro relied upon Esquilin's
statements but failed to provide sufficient information
to establish that Esquilin's statements were credible.
Defendant further contends that the information
provided by Hunt and Pangaro was prejudiced and tainted
by omission and manipulation.  We disagree.

     A search that is conducted based upon a properly
issued search warrant is presumed to be valid.  State
v. Sullivan, 169 N.J. 204, 211 (2001) (citing State v.
Valencia, 93 N.J. 126, 133 (1983)).  Defendant has the
burden of proving that the search was invalid,
specifically, "that there was no probable cause
supporting the issuance of the warrant or that the
search was otherwise unreasonable."  Ibid. (quoting
Valencia, supra, 93 N.J. at 133).  When considering a
challenge to the search, the court accords "substantial
deference" to the determination that resulted in the
issuance of the warrant.  Ibid. (quoting State v.
Marshall, 123 N.J. 1, 72 (1991), cert. denied, 507 U.S.
929, 113 S.Ct. 1306, 122 L.Ed. 2d 694 (1993)).

     Before issuing a search warrant, the judge must be
convinced "that there is probable cause to believe that
a crime has been committed, or is being committed, at a
specific location or that evidence of a crime is at the
place sought to be searched."  Id. at 210 (citing State
v. Laws, 50 N.J. 159, 173 (1967), cert. denied, 393
U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968)).
Probable cause is established if there is "a 'well
grounded' suspicion that a crime has been, or is being
committed."  Id. at 211 (quoting State v. Waltz, 61
N.J. 83, 87 (1972)).

     "Information provided by an informant may
constitute a basis for a finding of probable cause, so
long as there is a substantial basis for crediting the
information."  Id. at 212 (citing State v. Smith, 155
N.J. 83, 92, cert. denied, 525 U.S. 1033, 119 S.Ct.
576, 142 L.Ed.2d 480 ()1998)).  The totality of the
circumstances are considered when analyzing an
informant's tip in determining the validity of the
warrant under the Fourth Amendment.  Illinois v. Gates,
462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d

527, 548 (1983). The same test is employed when evaluating a search warrant under our State Constitution. State v. Novembrino, 105 N.J. 95, 122-23 (1`987).

When applying the "totality of the circumstances" test, we consider "the informant's 'veracity' and the informant's 'basis of knowledge.'" Smith, supra, 155 N.J. at 93. A deficiency in one factor may be compensated by a strong showing of the other, "or by some other indicia of reliability." State v. Zutic, 155 N.J. 103, 110-11 (1998) (quoting Gates, supra, 462 U.S. at 233, 103 S.Ct. at 2329, 76 L.Ed.2d at 545). Furthermore, "if police corroborate 'information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the basis of knowledge prong' as well as the veracity prong." Smith, supra, 155 N.J. at 95-96 (quoting Gates, supra, 462 U.S. at 270 n.22, 103 S.Ct. at 2349-50 n.22, 76 L.Ed.2d at 569 n.22 (White, J., concurring)). Details revealed in a tip may show that an informant's knowledge of the alleged criminal activity is derived from a trustworthy source. Id. at 94.

The record here shows that, when Hunt and Pangaro applied for the search warrants, they presented sufficient facts to establish that the information provided by Esquilin was credible. Although the officers were not aware of any instances where Esquilin had provided reliable information in the past, the information obtained by the officers in their investigations substantiated the basis of Esquilin's knowledge concerning defendant's involvement in the scheme to obtain construction materials using stolen and counterfeit checks. Esquilin admitted that he was a participant in the scheme. He was arrested while endeavoring to obtain materials at the home improvement store which were purchased with a stolen and forged check. The information provided by Esquilin clearly was based on inside knowledge.

The facts provided by the officers further established probable cause to believe that evidence concerning the theft and counterfeiting scheme would be found in the apartment at 150 Fifth Avenue. Esquilin provided information that tied defendant's criminal activity to the Fifth Avenue apartment. When he was

arrested, Esquilin was in possession of two Fleet Bank checks, which Esquilin said that he had obtained from defendant in the lobby of the building at 150 Fifth Avenue.  In addition, Esquilin had defendant's telephone bill, with the address 150 Fifth Avenue, apartment 3B3.

The police also provided sufficient information to establish probable cause to believe that evidence concerning the theft and counterfeiting scheme would be found at 908 Cookman Avenue.  As we pointed out previously, during his investigation, Pangaro learned that defendant was using counterfeit checks to obtain building materials.  Pangaro was informed that building materials had been ordered from a Tinton Falls supply company and delivered to 906 Cookman Avenue.  Pangaro further observed building materials being moved from 906 Cookman Avenue to 908 Cookman Avenue.  In addition, Young told Pangaro that defendant had given him counterfeit checks to pay for the delivery of the building supplies at 906 Cookman.  Young told Pangaro that defendant stayed at 908 Cookman, which was the residence of defendant's sister.  Pangaro also inspected the property at 908 Cookman and determined that it was being used to store building materials that had been obtained with counterfeit checks.

Defendant additionally argues that the affidavits submitted by Hunt and Pangaro were prejudiced and tainted by omission and manipulation of facts.  We disagree.

Where, as in this case, a search warrant is challenged on the ground that it was obtained by use of false or incomplete information, the defendant must make a "substantial preliminary showing" that the person knowingly or with reckless disregard for the truth, included a false statement in a warrant affidavit, and if the statement is essential to the probable cause determination, the defendant is entitled to a hearing to challenge the veracity of the statement. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 672 (1978).  If the defendant proves such falsity by a preponderance of the evidence, the statement must be omitted, and the warrant set aside unless the remaining evidence is sufficient to establish probable cause. Id. at 156, 98 S.Ct. at 2676, 57 L.Ed.2d at 672.

>    Defendant contends that Esquilin's assertion that defendant was involved in the scheme was brought into question by certain allegedly inconsistent statements. According to defendant, Esquilin told Hunt that he went with defendant to the building supply company on January 17, 2003 and presented a check in the amount of $4,999.73 but Merlin Alston (Alston), the company's sales clerk, said that Esquilin was the individual who came into the store and paid for the materials. Hunt included Esquilin's statement in the affidavit and did not mention Alston's statement. Defendant contends that if Hunt had included Alston's statement, Esquilin's assertion would have been revealed as a "lie, bringing the whole affidavit into question."
>
>    Defendant also points to other alleged inconsistent statements. Defendant says that Esquilin told the police that only he and defendant went to Newark to fence the merchandise, whereas Morcilio said that he also went with Esquilin to Newark. Furthermore, Esquilin asserted that he told Morcilio to rent a truck because Esquilin was moving but Morcilio told the police that Esquilin needed the truck to pick up the building materials. In addition, Esquilin said the defendant gave him a check in the lobby of the building at 150 Fifth Avenue but Lugo said that Esquilin tore a check out of a ledger and handed the check to Lugo to make the purchase.
>
>    We are not convinced that any of these purported inconsistencies rises to the level of a material misstatement of fact. Even if we accept defendant's assertions that these statements are inconsistent, the facts which remain in the affidavits are more than sufficient to establish Esquilin's veracity and the basis of his knowledge concerning the theft and counterfeiting scheme. Furthermore, Esquilin's assertions concerning defendant's involvement in the scheme, and the information generated by the police in the investigations, provided ample evidence for the judge's finding that there was probable cause for the searches. We therefore affirm the denial of defendant's motion to suppress and his motion for reconsideration.

(Opinion, Appellate Division, at 9-16.)

The Fourth Amendment to the U.S. Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

Generally, evidence gained through a Fourth Amendment violation may not be used against a defendant at trial. See Mapp v. Ohio, 367 U.S. at 654-55; Weeks v. United States, 232 U.S. 383, 391-93 (1914). This "exclusionary rule" is a judicially-created remedy to safeguard Fourth Amendment rights by deterring police conduct that violates those rights. Stone v. Powell, 428 U.S. 465, 486 (1976).

> In Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court examined the nature of the exclusionary rule, which it characterized as a "judicially created means of effectuating the rights secured by the Fourth Amendment" and balanced its utility as a deterrent against the risk of excluding trustworthy evidence and thus "deflect[ing] the truthfinding process." Id. at 482, 490, 96 S.Ct. 3037. Finding that, as to collateral review, the costs of the exclusionary rule outweighed the benefits of its application the Court concluded that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at

> his trial." Id. at 494, 96 S.Ct. 3037.  While the
> federal courts are not thus deprived of jurisdiction to
> hear the claim, they are -- for prudential reasons --
> restricted in their application of the exclusionary
> rule.  Id. at 494 n. 37, 96 S.Ct. 3037.

Marshall v. Hendricks, 307 F.3d 36, 81-82 (3d Cir. 2002), cert. denied, 538 U.S. 911 (2003).  "An erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the bar."  Gilmore v. Marks, 799 F.2d 51, 57 (3d Cir. 1986).

The Court of Appeals for the Third Circuit has recognized that there may be instances in which a full and fair opportunity to litigate was denied in state court.  See, e.g., Gilmore v. Marks, 799 F.2d at 57 (observing that a state's "failure to give at least colorable application of the correct Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation); Boyd v. Mintz, 631 F.2d 247, 250 (3d Cir. 1980) (assuming, without deciding, that "opportunity" simply means providing procedures by which one can litigate a Fourth Amendment claim, Stone v. Powell does not preclude federal habeas relief when "'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process'" (quoting Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977), cert. denied, 434 U.S. 1038 (1978))).

This case does not present one of those instances in which a full and fair opportunity to litigate was denied in state court. Petitioner was provided a pre-trial suppression hearing,

17

reconsideration of that decision, and two levels of appeal from the denial of his suppression motion.  Petitioner has been afforded a full and fair opportunity in the New Jersey court system to litigate his Fourth Amendment claims.  Accordingly, this Court cannot grant Petitioner habeas relief.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Jurists of reason would not disagree with this Court's determination.  Accordingly, no certificate of appealability shall issue.

V.  CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


                                              S/Freda L. Wolfson  
                                             Freda L. Wolfson  
                                             United States District Judge

Dated: 11-28-07